[Cite as *State v. Yerkey*, 2024-Ohio-724.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JOHN DEAN YERKEY,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MA 0057**

---

Criminal Appeal from the
Mahoning County Court Number 5
of Mahoning County, Ohio
Case No. 2021 CR B 00385

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Judges and
William A. Klatt, Retired Judge of the Tenth District Court of Appeals,
Sitting by Assignment.

---

**JUDGMENT:**
Reversed and Remanded.

---

*Atty. Gina DeGenova,* Mahoning County Prosecutor*, Atty. Edward A. Czopur,* Assistant Mahoning County Prosecutor*,* Mahoning County Prosecutor's Office for Plaintiff-Appellee and

*Atty. Martin Yavorcik*, for Defendant-Appellant.

Dated: February 26, 2024

**Robb, P.J.**

{¶1}   Defendant-Appellant John Dean Yerkey appeals after Mahoning County Court Number 5 convicted him of misdemeanor assault and sentenced him to six months in jail.  Appellant contests the sufficiency and the weight of the evidence.  These arguments are without merit.  Appellant also contends the trial court erred in forcing him to proceed through sentencing unrepresented after his attorney was permitted to withdraw at the beginning of the sentencing hearing and the court denied a request for a continuance and an inquiry into indigency or appointment of counsel.  The state concedes this error but claims the issue became moot once Appellant served the jail sentence.  However, we decline to apply the mootness doctrine to this error.  Accordingly, the trial court's judgment is reversed, and the case is remanded for resentencing with the assistance of counsel.

STATEMENT OF THE CASE

{¶2}   On December 18, 2021, Appellant was arrested for misdemeanor assault after the Beaver Township police responded to his house to investigate his girlfriend's 911 call.  Appellant retained counsel.  The initial no-contact order was rescinded by agreement in April 2022.  Upon the state's motion for discovery, the court ordered the in-camera production of a nondisclosure agreement Appellant entered with the victim.  The trial judge thereafter recused herself, and a visiting judge was appointed the same month. (6/7/22 Cert.); (6/17/22 J.E.).  The trial was continued after the parties entered a polygraph agreement.  (12/14/22 J.E.); (1/31/23 Ag.).

{¶3}   The case was tried to the court on February 8, 2023.  Under the prior agreement, the state introduced the polygraph results, which indicated Appellant was being deceptive in response to questions on choking the victim.  (Tr. 143, 178).

{¶4}   Testimony was presented by the investigating officer (who had over 30 years of experience as a police officer). He arrived at the residence with his fellow officer after they were dispatched based on a female caller's report that she had been assaulted by her boyfriend.  The victim was outside when the officer arrived; he had her sit in her vehicle and then summoned Appellant from the house.  (Tr. 32-33).  Appellant seemed

intoxicated but was cooperative; the officer thus left Appellant with the second officer and returned to the victim to obtain more details. (Tr. 34). The investigating officer observed marks on both sides of the victim's neck, which appeared consistent with her statement that she had been choked. (Tr. 34, 42).

{¶5} The second officer testified that he did not have a good view of the victim when they arrived and he stayed with Appellant on the porch while the other officer returned to further question the victim. (Tr. 47, 49). He confirmed Appellant smelled of alcohol. (Tr. 49).

{¶6} The victim testified she met Appellant through a dating website six months prior to the incident at issue. (Tr. 56-57). On the day of the incident, she arrived at Appellant's house in the afternoon with plans to stay overnight. After engaging in intimacy and drinking wine, they argued. Appellant accused her of lying about talking to the father of her children and was upset about her wanting to take a trip instead of attending his work party. (Tr. 63-64, 104). The victim said Appellant broke the wine glass she was using by slamming it on the concrete counter. (Tr. 139, 142). She said he asked her to leave and she began preparing to do so. (Tr. 105).

{¶7} The victim demonstrated how Appellant then came towards her with his hands outstretched. (Tr. 62-63). According to the victim, he answered in the affirmative when she asked, "you want to kill me?" (Tr. 65). Appellant then put his hands on her neck; the next thing she remembered she was waking up from unconsciousness on the floor. (Tr. 63). She said Appellant followed her outside while begging her not to call the police. (Tr. 118).

{¶8} The victim sent photographs of her neck to the police the next day because the photograph they took did not fully show the marks, which her testimony said were caused by the choking and were more visible the next day. (Tr. 66-68, 70). Defense counsel elicited that the victim had acne marks on her jawline in a photograph. (Tr. 110-113). The victim acknowledged she continued to communicate with Appellant after the assault, noting she loved him. (Tr. 130). Days after his arrest, she texted him, offering to talk and saying she was sorry for how things ended that night. (Tr. 126). She acknowledged having sex with him three weeks before trial. (Tr. 90-91).

{¶9} Appellant testified he was a chiropractor and confirmed meeting the victim through a dating website in May 2021. (Tr. 156, 158). On the day of the incident in December 2021, the victim came to his house. He said they were making up and they had sex, which he described as "more loving than sexual." (Tr. 158). The victim then spoke of going on a trip instead of attending his work party and criticized various aspects of his life; he admitted this "infuriated" him. (Tr. 159-162, 166). He said he told her to leave, but she kept "digging." (Tr. 162). Regarding the wine glass, he said he was about to throw it against the cabinet but then restrained himself and set it down too hard on the counter. (Tr. 167).

{¶10} According to Appellant, he approached the victim with his hands extended in order to usher her out of the house. (Tr. 167). He said he was going to "hold her in the arms and say * * * why are you doing this?" He claimed he did not put his hands around her neck, saying he barely touched her jacket as she collapsed to the ground. He said the victim called 911 while he was picking her up. (Tr. 169). According to Appellant, "she passed out because she was afraid." (Tr. 168).

{¶11} During the first question on cross-examination, Appellant interrupted to question why the prosecutor was not looking directly at him while speaking to him. (Tr. 172). When the prosecutor tried to question Appellant about his awareness of the victim's estrangement from her husband, Appellant apparently demonstrated aggression. The court ordered Appellant to sit down, and Appellant announced, "Well, he approached me." (Tr. 173-174, 184). The prosecutor discontinued the questioning and opined Appellant's demeanor proved the state's point. (Tr. 174-175, 184).

{¶12} The court found Appellant guilty of assault and instructed the assignment office to set the case for sentencing. (2/8/23 J.E.). Sentencing was set for March 31, 2023. Ten days before sentencing, Appellant's bond was revoked on the state's motion, which explained Appellant was being held in jail for threatening the victim after charges were filed against him in Hudson where the victim resided.

{¶13} Less than three hours before the sentencing hearing, defense counsel filed a motion to withdraw as counsel, stating his personal interest precluded him from continuing his representation of Appellant. This was based on his ownership of a house, which he originally purchased jointly with Appellant. He began leasing the house to

Appellant in the month of the incident at issue, when the house was placed in only the attorney's name. According to defense counsel, on the night before sentencing, he visited Appellant in jail (where he was held on the new charge related to threatening the victim). After Appellant expressed concern about his dogs, counsel went to the house and found large trenches or holes had been dug throughout the front yard (attaching photographs). Upon learning the basement had flooded, he entered the house the next morning and found the house in an "indescribably horrible" condition; counsel anticipated filing a police report to support an insurance claim.

{¶14} Counsel's motion also requested a continuance of sentencing and an inquiry into Appellant's indigency for purposes of appointing counsel to represent him at sentencing. At the sentencing hearing, the court first addressed this three-part motion. Defense counsel said he was somewhat aware of Appellant's financial circumstances and believed he was unable to engage private counsel and was eligible for court-appointed counsel under the circumstances. (Sent.Tr. 6). The state opposed a continuance and argued this was a delay tactic, pointing out the victim drove to town for the hearing. (Sent.Tr. 8). The court allowed counsel to withdraw but denied a continuance, opining there was no right to court-appointed counsel for a petty offense. (Sent.Tr. 13).[1]

{¶15} Defense counsel was excused from the courtroom before sentencing proceeded. The state then reviewed Appellant's prior convictions, pointing out he was on community control (for felony violation of a protection order) in Columbiana County when the instant offense was committed. (Sent.Tr. 15-16). The prosecution argued Appellant failed to accept responsibility for the offense against this victim and described him as violent, pointing to his behavior at trial.

{¶16} The victim then provided a statement. She spoke of strangulation as a predictor of future violence and pointed to Appellant's recent threatening text telling her she "was going to die by his own hands." She mentioned the emotional damage he caused and the concerns about her brain lacking oxygen long enough for her to lose consciousness. (Sent.Tr. 19-24).

---

[1] The docket shows in August 2022, the state filed a motion to remove defense counsel and to appoint substitute counsel, which the court allowed to be filed under seal. The motion was opposed by the defense. The trial court denied the state's motion. (9/1/22 J.E.).

{¶17} Appellant spoke on his own behalf, stating some of the history was misrepresented and his economic situation would become worse if he were sentenced to incarceration. (Sent.Tr. 25). The court made note of Appellant's "startling" reaction during cross-examination, stating it was "very clearly a demonstration of your inability to control yourself and your temper." (Sent.Tr. 26).

{¶18} The court imposed a maximum jail term of 180 days (with 10 days jail-time credit), specifying the release date of September 16, 2023. Appellant's oral request for a stay pending appeal was denied by the trial court. (4/3/23 J.E.).

{¶19} Appellant thereafter sent a letter to the clerk requesting court-appointed counsel for his appeal due to indigency. The county court's administrative judge granted the request and appointed counsel, finding Appellant was indigent. (4/21/23 J.E.). A timely notice of appeal was filed by the appointed attorney, who in turn filed an affidavit of indigency for Appellant and asked this court to appoint appellate counsel. This court appointed new counsel. (5/11/23 J.E.).

{¶20} In June 2023, counsel moved for a stay of the sentence pending appeal, and we granted the stay upon the posting of bail. (6/20/23 J.E.). Thereafter, Appellant filed his brief raising two assignments of error. The state's subsequent response brief says Appellant remained incarcerated as he did not post bail. A reply brief was not filed.

## SUFFICIENCY AND WEIGHT OF THE EVIDENCE

{¶21} We address Appellant's two assignments of error in reverse order, corresponding to the flow of the case through the court (thereby addressing the sentencing issue last). Appellant's second assignment of error contains two separate contentions as it argues the following:

"The trial court erred in allowing a conviction when it was not supported by sufficient evidence and against the manifest weight of the evidence."

{¶22} If a conviction is not supported by sufficient evidence, the defendant cannot be retried as jeopardy will have attached; this is unlike an initial reversal on weight of the evidence, which can be retried. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *Tibbs v. Florida*, 457 U.S. 31, 41, 47, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). All evidence offered by the state and admitted by the trial court, whether erroneously or not, can be considered to determine whether the evidence was sufficient

to sustain the guilty verdict (because the remedy for evidentiary error is a new trial). *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 16-20; *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 80, citing *Lockhart v. Nelson*, 488 U.S. 33, 35, 38, 40-42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

**{¶23}** Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

**{¶24}** In reviewing the sufficiency of the evidence, we view the evidence, including reasonable inferences, in the light most favorable to the prosecution to ascertain whether a rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (consider all evidence, including reasonable inferences, in the light most favorable to the prosecution). *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). *See also State v. Filiaggi,* 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999) (viewing reasonable inferences in favor of the state). Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

**{¶25}** The elements of the relevant misdemeanor assault offense are to "knowingly cause or attempt to cause physical harm to another * * *." R.C. 2903.13(A). Physical harm means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). A defendant's intent rests in his mind and is therefore proven by the surrounding circumstances and inferences rather than by direct evidence. *Treesh*, 90 Ohio St.3d at 484-485.

Case No. 23 MA 0057

**{¶26}** Appellant's brief emphasizes the victim's acknowledgement that Appellant previously placed his hands around her neck during sex. He also points out the victim said they had sex on the day of the incident. He discounts the photographs the victim took of her neck on the day after the incident, pointing to the questioning on the source of the marks visible in the photograph. He says the officer, who testified the marks were consistent with the victim's statement about being strangled, was unaware the victim suffered acne on her neck. He notes the other officer did not examine the victim's neck. Appellant also points to his own testimony claiming he did not assault the victim but rather she passed out after he ordered her to leave his house. These observations are more pertinent to a weight of the evidence argument than a sufficiency argument.

**{¶27}** As set forth in the Statement of the Case above, the victim testified Appellant approached her with his hands outstretched during an argument in the kitchen. She said he answered in the affirmative when she asked, "you want to kill me?" The victim testified Appellant then put his hands on her neck, and the next thing she remembered was waking up from unconsciousness on the floor. He followed her to the car begging her not to call the police. Her testimony indicated the pertinent marks in the photographs of her neck that she took the next day were caused by Appellant's act of choking her during the argument and were not marks from acne. The officer saw marks on her neck consistent with her statement. She also specifically answered that Appellant never choked her during sex and that if he "sometimes" put his hands on her throat, it was "playful" and not threatening or mark-inducing. (Tr. 71). On the day of the incident, she said he "gently" held the back of her neck and this did not cause the marks on her neck. (Tr. 73).

**{¶28}** For our sufficiency review, this evidence is viewed in the light most favorable to the state, and the question is merely whether "any" rational mind could find the elements were established. *Getsy*, 84 Ohio St.3d at 193. *See also Yarbrough*, 95 Ohio St.3d 227 at ¶ 79, 82 (sufficiency review evaluates the state's evidence as if it was believed). Some rational fact-finder could find Appellant committed assault by knowingly causing or attempting to cause physical harm to the victim. Accordingly, the state presented sufficient evidence to support the misdemeanor assault conviction.

{¶29} Weight of the evidence concerns the effect of the evidence in inducing belief, and our review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The appellate court considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

{¶30} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. This is because the trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). When more than one competing interpretation of the evidence is available and the one chosen by the fact-finder is not unbelievable, we do not choose which theory we believe was more credible and impose our view over that of the fact-finder. *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 148.

{¶31} Despite the victim's continued contact with Appellant, her testimony was credible. Most notably, the trial court watched the victim and Appellant as they testified on the stand, during which indicators of truthfulness would be observed first-hand and considered by the weighing entity. The choice to believe the victim's testimony and to disbelieve Appellant's testimony about the choking incident was clearly within the province of the judge presiding over the bench trial. The evidence did not weigh "heavily" against the convictions, and this was not an "exceptional" case where a trial court "clearly lost its way" so as to create a "manifest miscarriage of justice" and require a new trial.

*Lang*, 129 Ohio St.3d 512 at ¶ 220, quoting *Thompkins*, 78 Ohio St.3d at 387.  In accordance, the decision to find Appellant guilty of assault was not contrary to the manifest weight of the evidence.  This assignment of error is overruled.

<u>LACK OF COUNSEL AT SENTENCING</u>

**{¶32}** Appellant's sentencing assignment of error argues:

"The trial court erred in failing to appoint counsel at sentencing."

**{¶33}**  To recap, defense counsel was retained by Appellant prior to his December 21, 2021 initial appearance.  Counsel actively represented Appellant throughout the case, including by:  securing a non-disclosure agreement with the victim (prompting a motion to compel by the state in April 2022); opposing a state's motion to be substituted by new counsel in August 2022; and negotiating a polygraph agreement in December 2022.  The case was tried to the court on February 8, 2023.  The court entered a guilty verdict the next day; however, sentencing was not set to take place until seven weeks later.  At the end of this period, Appellant was arrested for threatening the victim.

**{¶34}** On the morning of sentencing, Appellant's attorney filed a motion to withdraw as counsel based on a conflict of interest that he said became apparent the night before sentencing, when he went to Appellant's house while Appellant was being held in jail (on the aggravating menacing charge related to the latest threat he made to the victim).  The attorney's motion said he owned the house where Appellant lived; they previously owned it jointly, but the deed reflected only the attorney's name as of December 2021, when Appellant signed a lease.  The attorney said he visited Appellant in jail on the night before sentencing and then went to check on Appellant's dogs, at which time he noticed there were deep holes dug throughout the yard.  Based on his concerns the basement had flooded, he entered the house the next morning and discovered it was in an "indescribably horrible" condition.  The attorney said he would be filing an insurance claim and a police report would be required.  Counsel also said Appellant had not tendered his contractual housing payments for months.

**{¶35}**  In addition to asking to withdraw as counsel, the motion asked to continue sentencing and to determine Appellant's indigency status for purposes of appointing counsel.  At the sentencing hearing, defense counsel said he was somewhat aware of

Appellant's financial circumstances, opining Appellant could not engage private counsel and was eligible for court-appointed counsel under the circumstances.

**{¶36}** The court permitted withdrawal and excused counsel from the hearing. The court denied the request for appointed counsel and the request for a continuance of sentencing. There was no inquiry as to whether Appellant wished to represent himself or had an ability to retain counsel. The court explained Appellant was charged with a petty offense. *See* Crim.R. 2(C) (a misdemeanor is only a serious offense if "the penalty prescribed by law includes confinement for more than six months"), (D) (a petty offense is "a misdemeanor other than a serious offense"). The court then concluded there was no right to counsel for a petty offense.

**{¶37}** Appellant counters there is a right to counsel when incarceration is possible, pointing out incarceration was imposed upon him. He cites the rule providing:

> Where a defendant charged with a petty offense is unable to obtain counsel, the court may assign counsel to represent the defendant. When a defendant charged with a petty offense is unable to obtain counsel, no sentence of confinement may be imposed upon the defendant, unless after being fully advised by the court, the defendant knowingly, intelligently, and voluntarily waives assignment of counsel.

Crim.R. 44(B).

**{¶38}** "Waiver of counsel shall be in open court and the advice and waiver shall be recorded as provided in Rule 22." Crim.R. 44(C) (with the additional requirement of a written waiver only applying in serious offense cases). Likewise, the cited Crim.R. 22 states, "in petty offense cases all waivers of counsel required by Rule 44(B) shall be recorded." Courts indulge in every reasonable presumption against waiver. *State v. Wellman*, 37 Ohio St.2d 162, 171, 309 N.E.2d 915 (1974). Whether one is "unable to obtain counsel" does not depend on indigency. *See, e.g., State v. Tymcio*, 42 Ohio St.2d 39, 44, 325 N.E.2d 556 (1975).

**{¶39}** "In a misdemeanor case, every waiver of the right to counsel must be made on the record in open court. For a petty offense, voluntary and knowing waiver may be shown through the court's colloquy with the defendant." *Brooke*, 113 Ohio St.3d 199 at ¶ 54 (for serious offenses, the waiver must also be in writing). In all cases where the

defendant waives an attorney, the trial court must sufficiently inquire of the defendant in order to ascertain he fully understands and intelligently relinquishes the right to counsel. *Id.* at ¶ 53. "While literal compliance with Crim.R. 44(C) is the preferred practice, the written waiver provision of Crim.R. 44 is not a constitutional requirement, and, therefore * * * trial courts need demonstrate only substantial compliance." *State v. Martin*, 103 Ohio St. 3d 385, 392, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 38.

**{¶40}** "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." Sixth Amendment to the U.S. Constitution. This gives the defendant the right to have counsel present at all critical stages of the criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227-228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Schleiger*, 141 Ohio St.3d 67 at ¶ 13. "[S]entencing is a critical stage of the criminal proceeding at which [the defendant] is entitled to the effective assistance of counsel." *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977). A structural error may result when there is a deprivation of the right to counsel at a critical stage. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 165 L.Ed.2d 409, 126 S.Ct. 2557 (2006) (denial of choice of counsel to non-indigent). A structural error is a constitutional error that is automatically reversible without being subject to a harmless error analysis. *Id.*; *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17-18. [2]

**{¶41}** Appellant concludes the trial court violated Crim.R. 44 by not obtaining a knowing, intelligent, and voluntary waiver of counsel before sentencing him to incarceration after it permitted retained counsel to withdraw and refused to appoint counsel to represent him at sentencing. Although the prosecution below encouraged the denial of a continuance to obtain or to be appointed counsel, the state now concedes the error. However, the state contends the error is moot in this case because Appellant served his entire sentence.

**{¶42}** A court can consider items outside (and occurring after) the trial record to determine if an appeal is moot. *State ex rel. Cincinnati Enquirer v. Dupuis*, 98 Ohio St.3d

---

[2] The current situation (fully represented by counsel before and at trial but unrepresented at sentencing) is not akin to cases where a defendant is deprived of representation before and during trial (and receives an appellate remedy limiting the resentencing sanctions to those other than incarceration).

126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 8 ("An event that causes a case to become moot may be proved by extrinsic evidence outside the record."). As specified in the sentencing entry, which also denied a stay pending appeal, Appellant's sentence expired on September 16, 2023. As explained above, this court granted a stay of the sentence pending appeal, but Appellant did not post bail.

**{¶43}** "[W]here a criminal defendant, convicted of a misdemeanor, voluntarily satisfies the judgment imposed upon him or her for that offense, an appeal from the conviction is moot unless the defendant has offered evidence from which an inference can be drawn that he or she will suffer some collateral legal disability or loss of civil rights stemming from that conviction." *State v. Golsto*n, 71 Ohio St.3d 224, 226, 643 N.E.2d 109 (1994) (requirement of demonstrating collateral consequences to avoid mootness doctrine does not apply to felonies), citing *State v. Wilson*, 41 Ohio St.2d 236, 237, 325 N.E.2d 236 (1975) (where the Court found "the payment of a fine and costs in a criminal case renders the conviction moot, so as to preclude review of attack on the conviction or sentence"). The Supreme Court has discussed what it means to "voluntarily" serve a sentence for purposes of the mootness doctrine and found a misdemeanant did not voluntarily complete the sentence where he unsuccessfully sought a stay in trial court (and paid his fine and costs). *Cleveland Heights v. Lewis*, 129 Ohio St.3d 389, 2011-Ohio-2673, 953 N.E.2d 278, ¶ 20 (even though he failed to seek a stay of his sentence from the appellate court).

**{¶44}** On this topic, we note that soon after we granted a stay upon the payment of bail in this case, Appellant was sentenced to ten months in prison in his Columbiana County community control revocation cases cited in our bail order. *See State v. Yerkey*, Col.Cty.Nos. 2018 CR 263 and 2018 CR 307 (7/13/23 J.E.s). This would affect the evaluation of the voluntariness of the continued service of the misdemeanor sentence in the case at bar; i.e., posting bond in this case would have been futile.

**{¶45}** Furthermore, in addition to imposing a six-month jail sentence, the trial court assessed all court costs against Appellant. (4/3/23 J.E.). The clerk's records shows costs are still outstanding. "Although an appellant may have completed the incarceration portion of his sentence, the failure to also pay fines or court costs in a misdemeanor case has been deemed sufficient by Ohio appellate courts to preclude a determination that an

appeal is moot." *State v. Carnahan,* 9th Dist. Wayne No. 18AP0029, 2019-Ohio-3217, ¶ 8, citing *State v. Nared*, 2d Dist. Clark No. 2017-CA-3, 2017-Ohio-6999, ¶ 12 (rejecting the state's argument on mootness where the jail sentence was served but court costs were outstanding); *State v. Hoff*, 5th Dist. Fairfield No. 02-CA-89, 2003-Ohio-3858, ¶ 12 (appeal was not moot where defendant still owed court costs). *See also Golst*on, 71 Ohio St.3d at 226 (mentioning an evaluation of whether costs were paid), citing *Wilson*, 41 Ohio St.2d 236 (where the Court said an appeal of a conviction or sentence could be rendered moot if the defendant paid the fine and costs).

**{¶46}** Finally, it often benefits the state to ensure a defendant was not deprived of counsel on a petty offense for purposes of future enhancement matters. As discussed in the cases cited by Appellant, an uncounseled conviction may not be used for enhancement of a later offense if the record fails to demonstrate compliance with the requirements of Crim.R. 44 where there was a potential for incarceration. *See State v. Brooke*, 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024 (where the defendant was unrepresented at prior guilty pleas); *State v. Bode*, 144 Ohio St.3d 155, 2015-Ohio-1519, 41 N.E.3d 1156 (applying *Brooke* to enhancements based on prior juvenile adjudications and refusing to limit the rule to cases where incarceration is actually imposed), citing *State v. Schleiger*, 141 Ohio St.3d 67, 2014-Ohio-3970, 21 N.E.3d 1033, ¶ 12–17 (defendant was entitled to counsel at a resentencing hearing on remand for the limited purpose of correcting the imposition of post-release control).

**{¶47}** Our decision on mootness thus relies on more than our knowledge of the detriments of being unrepresented at sentencing or on the inferences of how others would view a six-month maximum jail sentence on Appellant's criminal record. For the various reasons outlined, we decline to declare moot the error depriving Appellant of counsel at sentencing, an error conceded by the state. Accordingly, we sustain this assignment of error (labeled by Appellant as the first assignment of error) and remand for appointment of counsel and resentencing.

**{¶48}** For the foregoing reasons, the trial court's judgment is reversed, and the case is remanded for resentencing.

Waite, J., concurs.

Klatt, J., concurs.

Case No. 23 MA 0057

---

For the reasons stated in the Opinion rendered herein, the assignments of error are sustained and it is the final judgment and order of this Court that the judgment of the Mahoning County Court Number 5 of Mahoning County, Ohio, is reversed. We hereby remand this matter to the trial court for resentencing with the assistance of counsel, according to law and consistent with this Court's Opinion. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**